IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

HELEN MICHAEL,

                Plaintiff,

v.                                                              Civil Action No.5:05-CV-47

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**


**I.  Introduction**

A.      Background

        Plaintiff, Helen Michael, (Claimant), filed her Complaint on April 4, 2005 seeking Judicial

review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social

Security, (Commissioner).[1]  Commissioner filed her Answer on June 7, 2005.[2]  Claimant filed her

Motion for Judgment of Reversal on July 7, 2005.[3]  Commissioner filed her Motion for Summary

Judgment on August 3, 2005.[4]

B.      The Pleadings

                1.        Claimant's Motion for Judgment of Reversal.

_____

        [1] Docket No. 1.

        [2] Docket No. 2.

        [3] Docket No. 3.

        [4] Docket Nos. 4.

2.   <u>Commissioner's Motion for Summary Judgment</u>.

C.   <u>Recommendation</u>

1.   I recommend that Claimant's Motion for Summary Judgment be
DENIED because the ALJ was substantially justified in his decision.  Specifically, the ALJ properly
(1) assessed Claimant's RFC; (2) analyzed Claimant's  mental impairments; and (3) relied upon the
testimony of the VE.

2.   I recommend that Commissioner's Motion for Summary Judgment be
GRANTED for the same reasons set forth above.

## II.  Facts

A.   <u>Procedural History</u>

 On November 27, 2002, Claimant filed her application for Disability Insurance Benefits
(DIB) alleging disability since October 15, 2002.  The application was denied initially and on
reconsideration.  A hearing was held on January 23, 2004  before an ALJ.  The ALJ's decision,
dated September 10, 2004, denied the claim finding Claimant not disabled within the meaning of
the Act.  The Appeals Council denied Claimant's request for review of the ALJ's decision on
January 27, 2005.  This action was filed and proceeded as set forth above.

B.   <u>Personal History</u>

Claimant was 29 years old on the date of the January 23, 2004 hearing before the ALJ.
Claimant has a high school equivalent education and past relevant work experience as a
housekeeper, cashier, convenience store worker, custodian, CNA and companion.

C.   <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: October 15, 2002–September 10, 2004.

**West Virginia Disability Determination Service, B.J. Kerbyson, D.O., 2/11/03, Tr. 130-133**
IMPRESSIONS:
1.      Probable congenital defect of the legs and ankles.
2.      Possible peripheral vascular disease.

**Physical Residual Functional Capacity Assessment, 3/7/03, Tr. 136-143**
Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., sit 6 of 8 hours, unlimited push and pull.

Postural limitations: except for climbing– frequently.

Manipulative limitations: None established.

Visual limitations:  None established.

Communicative limitations: None established.

Environmental limitations: Avoid concentrated exposure to extreme cold; heights.

**West Virginia Department of Health and Human Resources, 4/11/03, Tr. 144-150**
Diagnosis: ankle pain, right, since MVA 11/25/2002; congenital clubfoot, right, s/p reconstruction, 1990.

**Physical Residual Functional Capacity Assessment, 7/11/03, Tr. 151-158**
Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., sit 6 of 8 hours, unlimited push and pull.

Postural limitations: None established.

Manipulative limitations: None established.

Visual limitations:  None established.

Communicative limitations: None established.

Environmental limitations: None established.

**Podiatry Associates of Hagerstown, 10/19/03, Tr. 163-165**
Diagnoses: res cavus, claw toe deformity 2-5, forefoot abductus, hammered hallux bilateral.

**Podiatry Associates of Hagerstown, 5/21/03, Tr. 166**Severe contracture of all ten toes; cavo varus deformity.

**Podiatry Associates of Hagerstown, 5/21/03, Tr. 167**
Impression: Hammertoes

**Podiatry Associates of Hagerstown, 10/28/03, Tr. 168, 171-172**
IMPRESSION: The patient clinically seems to have Charcot-Marie-Tooth diseases.  There is significant atrophy of the extensor compartment of both lower extremities.  She has high arches in the feet and hammertoes and weakness of eversion and dorsiflexion of the feet.

**West Virginia Disability Determination Service, Mental Status Evaluation, 5/30/04, Tr. 173-179**
Diagnosis:
AXIS I:        Depressive Disorder, NOS.
                   Anxiety Disorder, NOS.
AXIS II:       Borderline intellectual functioning.
AXIS III:      Charcot-Marie-Tooth disorder.

**Medical Source Statement of Ability to Do Work-Related Activities (Mental), 5/29/04, Tr. 180-181**
Ability to understand and remember short, simple instructions; carry out short, simple instructions affected by impairment: None

Ability to understand and remember detailed instructions; carry out detailed instructions; to make judgements on simple work-related decisions affected by impairment: slight.

Ability to interact appropriately with the public; with supervisor(s); with co-worker(s); respond appropriately to work pressures affected by impairment: moderate.

Ability to respond appropriately to changes in a routine work setting affected by impairment: slight.

D.        Testimonial Evidence

1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 195-224):

Q        Have you tried to go back for any other kind of training?

A        I back [sic] to James Ramsey in West Virginia for computers, but my hands couldn't type fast - - I couldn't move my fingers fast enough.

Q      Okay.  So you didn't complete that?

A      No.

*                    *                    *

A      Okay.  I have [INAUDIBLE] disease.  It affects my lower extremities and like my hands and stuff and my feet.

Q      Now, you have tell me - -

A      And - -

Q      Tell me what it does.  Tell me what you feel.  Just - - I don't know - - what's the picture you got, ma'am?

A      It's what - -

Q      [INAUDIBLE].

A      It's what CNT is.  It - -

Q      I don't want you to tell me what the diagnosis is or what somebody else says or - -

A      You want me to tell you what I feel?  All right.  I feel - -

Q      I want you to tell me exactly what you feel.

A      I feel pain every time I take a step.  My right ankle fees like - - I don't know if you know what it feels like when you got something broke, but it feels like my bone on the top of my foot is hitting the bottom bone on my feet, and every time I take a step, it is breaking and crushing and grinding each other like they're - - it's friction.  And my toes - -

Q      And that's the right foot?

A      Yes.

Q      Go ahead.

5

A        My toes are bent and I - - they keep bending more because I'm using my toes and they're contracting because of the disease and they're bending into the floor, and they're getting like I have a blister on my left foot - - well, it's not like a blister.  It's like an ulcer or a talus from my toes bending back to hit it from where I'm putting all my pressure on my left foot to protect my right foot where I got a brace on my ankle that if it gets cold - - well, gets warm instead of cold, it's like my leg just - -

Q        Let me stop you a second.  Brace on ankle.  Is that the right ankle again?

A        Yes.

Q        Or the left ankle?

A        Right.

Q        Okay.  How long you had the right brace?

A        I've wore it since November of - - wait a minute - - 2002.

Q        Okay.  Go ahead.  You were telling me about the brace - -

A        No, wait a minute.  It was 2001 - -

Q        [INAUDIBLE].

A        - - because I wore it all year last year.

Q        Well, last year was 2003.

A        Yeah, it was 2002 then.  Sorry about that.

Q        That's okay.  Just take your time and we'll make sure we get the dates straight, et cetera.  So you were saying something about the brace, what?

A        Okay.  My brace - - when it gets hot, it rubs like friction - - I can't say like friction.  Like if you have something against your leg, how it rubs.  It rubs like - -

Q      Um-hum.

A       - - and it makes my leg burn, and it leaves like red spots all the way down it when I leave it on because of the ice in it chills - - gets warm.  And I - - and when I'm on my feet too long, I have - - I can't say it's like tremors going up my leg, but it's like pain shooting up and down my legs, both of them.  I mean it hurts.

Q      Okay.

A      And my feet swell.

Q      Okay.

A      And I'm very stressed out because I - - to me, I don't think I can work because I mean if I can't stand to - - all right.  When I'm at the house, I'm walking from my bedroom to my kitchen.  I can't - - unless I have a brace on because it's helping me walk.

Q      So you walk from your bedroom to the kitchen, but you have to have the brace on in order to do that?

A      I can walk from my bedroom to the kitchen, but I limp really, really bad.  It's really  not even - - I mean I'm holding on to things.  It's worse than - - I mean I'm holding on to things so it doesn't break.  I mean I can't feel pain when I hit until afterwards.  I mean it takes a long time for the pain to actually register.  My foot has - - well, my feet - - they're - - I guess it's called dropped arches or whatever it is, where your arches collapse because you're trying to protect your back of your ankle or whatever it is [INAUDIBLE].

                    *              *              *

Q      Let's go back to the shooting pains you're talking about.  Where's the pain start and where does it shoot to?

7

A It starts I guess the inside of my ankle, on the inside of the foot, but it's like - -

Q Okay.  When you talk the inside, are you talking on the inside - -

A Where your two feet go together.

Q Okay.

A If you put your feet together, that inside.  I'm talking about that inside.  Okay.  The inside right there where the inside arch is.  It starts right there.

Q From the arch up.

A The inside arches.

Q And how far up does it go?

A I'd say it goes to my knees and then my knees they got like little pieces of bone missing from where they're got so much weight pushing down on them that they're grinding each other.

Q Now, who told you, you had bone pushing out of your knee?

A No one.  I could fee it.  I'm not saying it's actually missing, but you know how it's like chipped - -

Q Okay.

A - - or like water on your leg.

*   *   *

Q Can you bend or stoop, pick something up off the floor?

A No.

Q Not at all?

A If I - - I can stand on my feet and then I got to bend in my waist.  I can't bend my

knees to down. My knees won't hold.

Q        And how long has that been a problem that your knees won't hold?

A        I'd say 2000, 2002, somewhere in there. Since they've had like this pressure on them.

*                    *                    *

Q        How about if you were standing?

A        If I'm standing still, maybe 10 pounds, but if I'm moving, none.

Q        Well, why none?

A        Because I lose my balance.

Q        Not able to carry a purse or something with you when you go places?

*                    *                    *

Q        What was the [INAUDIBLE]?

A        I meant in my hands. Like if it was a box or something, I can't carry that.

*                    *                    *

Q        Any problems using your hands?

A        Sometimes.

Q        What problems do you have?

A        It feels like the stick.

Q        I'm not quite sure I understand what you mean by the stick, so try to explain to me what - -

A        Don't bend.

Q        Okay. You think your fingers don't bend sometimes or does it take sometime to

get them to move?

A       Yeah, it's like the stick - - it's like they lock.

Q       So like the fingers lock up?

A       Yeah.

Q       And how long you been having problems with that?

A       Regularly.

Q       Just the last week, the last month?

A       About the last month.

*          *          *

A       I don't know if I told you that I'm depressed because I can't do things.

Q       All right.  Tell me about that.

A       I sometimes feel like everybody - - like the world's passing me by.

Q       And you've been crying a little bit through the hearing today.  Is that normal for you - -

A       Yes.

Q       - - to sit and cry and having crying spells?

A       Yeah.

Q       And how long have you been having that?

A       Since I started feeling reckless, but I - - can't support myself.

*          *          *

### 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 224-230):

A     Yes, the Claimant has worked as a convenience store worker.  As performed, that work was heavy and unskilled.  And then there was also work as a retail sales clerk, which had cleaning duties and cashier duties.  That work was light and unskilled.  Then there was work as a housekeeper at an inn.  As performed, that work was medium and unskilled.  A custodial worker in a restaurant.  That work was medium and unskilled.  Claimant has worked at two separate employers as a certified nursing assistant.  That work was medium and semi-skilled.  And finally, the Claimant has worked as a companion.  That work was light and unskilled.

Q     Assume we have an individual the same age, education and past work experience as the Claimant.  For the purpose of this hypothetical, we'll assume the individual can lift up to 50 pounds while seated, carry 10 pounds at rest - -

A     Your Honor, you said 50 pounds?

Q     Up to 50 pounds when seated and 10 pounds standing.

A     Right.

Q     Can only occasionally climb ramps or stairs, no ladders, ropes or scaffolds, avoid concentrated exposure to cold, avoid unprotected heights.  Any jobs that individual could perform?

A     Your Honor, there are jobs you can consider for such a hypothetical such as the medium kitchen helper.  There is - - this is unskilled work.  There are approximately 2,000 of these positions performed in the local region. The local region the numbers are a 50 mile radius of Hagerstown, Maryland, which would include that part of West Virginia.  There are about

11

290,000 of these positions performed nationally.  Your Honor also could consider the medium

packer.

CLMT:        Yeah, right, man.

VE              There are about 500 of these positions performed locally and about

275,000 nationally.  Those are two examples.  I can give more.

BY ADMINISTRATIVE LAW JUDGE:

Q        [INAUDIBLE] is less - - is that - - are these numbers the same as or - -

A        No, these numbers are less.  They're reduced by about 50 percent.

Q        If you would change the hypothetical and let's indicate limiting the individual to

sedentary work, same level of limitations, any jobs?

A        Yes, there are jobs you can consider such as a cashier position.  They are about

350 of these positions performed locally and about 140,000 nationally.  There's also information

clerk.  There's about 390 of these positions performed locally and about 145,000 nationally.

And finally, security worker.  About 300 locally and about 95,000 nationally.

Q        And if we were to add the individual needed - - the jobs would have to be one,

two step in nature and mental interaction with others, any jobs or any change in jobs your

already mentioned?

A        The - - all of these positions have interactions with others.  That would give you

other positions such as a packer - - sedentary packer.  There's about 250 locally and about

90,000 nationally.  In the sedentary [INAUDIBLE], about 275 locally and about 95,000

nationally.

Q        And discrepancy between the Dictionary of Occupational Titles and

[INAUDIBLE]  how these jobs are done and the limitations would be?

A       No, Your Honor.

ALJ       Anything else you want me to ask the vocational expert, any clarifications you want made?

CLMT       Yeah, I told you guys 50 pounds sitting down.  I was thinking about 50 pounds is a lot.  I can't lift that much.  I was thinking, five, 10 pounds.

ALJ       How much?

CLMT       Well, I'd say about 20 because I was thinking 50 pounds is - - that's what my husband lifts when he lifts dog food.  I can't lift that.

ALJ       So you think its 20 pounds?

CLMT       Yeah, if that.  I'd say the small pounds of dog food because I was sitting here thinking 50 pounds.  That's a lot.  I can't lift that.

VE       [INAUDIBLE].

ALJ       Anything else?

CLMT       No, but I do know that half of those jobs that he said you cannot do them sitting down like the stackers - - the bag - - boxers and the cashier.  I've tried that.  People to hire me  sitting down and they said no, it's a stand up job.

ALJ       He didn't mention any stacker or boxer.  He gave the - -

CLMT       It's the - -

ALJ       - - packing job.

CLMT       Yeah, the packing job, like apple packing and stuff like that - - I've called people like that and - -

ALJ          Now, he's - - okay, ma'am.  Let me just clarify.  The job - - the [INAUDIBLE] that are jobs that exist that do allow sit down and 10 pounds is the most.  Now, you may [INAUDIBLE] once before you have to stand.  The apple packing and those other ones that it's heavier lifting - -

E.       Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

• Completed the CNA program in 1999.  (Tr. 202).

• Drives.  (Tr. 213).

• Goes to the store once a month.  (Tr. 213).

• Reads.  (Tr. 214).

• Cooks every day, prepares supper.  (Tr. 215, 221).

• Washes the dishes.  (Tr. 215).

• Mops.  (Tr. 215).

• Sometimes vacuums.  (Tr. 215).

• Makes her bed.  (Tr. 215).

• Does her laundry.  (Tr. 216).

• Can walk about "two aisles in a store."  (Tr. 217).

• Can stand for 5 minutes.  (Tr. 217).

• Can sit "forever."  (Tr. 217).

• Can climb stairs if she holds a railing.  (Tr. 217).

- Can reach in front of her, overhead.  (Tr. 218).

- Can pick up 10 pounds.  (Tr. 128).

- Can carry a gallon of milk.  (Tr. 219).

- Can make change.  (Tr. 220).

- Reads magazines, writes in her diary.  (Tr. 221).

### III.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant contends that the ALJ (1) failed to properly assess Claimant's RFC; (2) failed to follow the proper procedure for analyzing mental impairments; and (3) erroneously relied upon the testimony of the VE.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, the Commissioner maintains that the ALJ properly (1) determined Claimant's RFC; (2) analyzed Claimant's mental impairments; and (3) relied on the testimony of the VE.

B.      The Standards.

1.      Summary Judgment.   Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2. Judicial Review. Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3. Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4. Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. Disability Prior to Expiration of Insured Status- Burden. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6. Social Security - Standard of Review. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. Hayes

v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C.    <u>Discussion</u>

1.  THE ALJ ERRONEOUSLY ASSESSED CLAIMANT'S RFC.

Claimant asserts that the ALJ erred in determining Claimant's Residual Functional Capacity (RFC). Specifically, Claimant claims that the ALJ failed to evaluate Claimant's RFC in accordance with Social Security Rule 96-8p ("SSR 96-8p"). Commissioner counters that the ALJ properly determined Claimant's RFC.

A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. <u>Id</u>. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. <u>Id</u>. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. <u>Id</u>. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. <u>Id</u>. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. <u>Id</u>.

SSR 96-8p provides that the assessment of residual functional capacity must be based upon all of the relevant evidence, considering all allegations of physical and mental limitations or restrictions. When allegations of physical and mental limitations or restrictions are made, the ALJ is to consider each function separately in making an assessment of residual functional capacity. <u>See</u> SSR 96-8p. Accordingly, the ALJ is obligated to consider only those limitations or restrictions which are alleged and/or based upon relevant evidence. If there is no allegation of a physical or mental limitation or restriction of a specific functional capacity and no information is found in the record that there is such a limitation or restriction, the ALJ must consider the

individual to have no limitation or restriction with respect to that functional capacity.  Id.

SSR 96-8p requires the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence" when assessing a claimant's RFC.  Id.

Claimant cites See v. Washington Metropolitan Transit Authority, 36 F.3d 375 (4th Cir. 1994), for the proposition that an ALJ is "statutorily required to include a discussion of findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record."  Id. at 384 (quoting 5 U.S.C.A. 557 (c)(3)(A)(West 1996)). Although the ALJ is required to indicate the weight given to all relevant evidence, Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984), the Fourth Circuit does not require that the ALJ discuss every piece of evidence.[5]   It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence.  Hays, 907 F.2d at 1456.  In reviewing the decision of the ALJ, the Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

In this case, the ALJ concluded that, while Claimant's allegations of pain were credible,[6]

---

[5]  The Undersigned notes that the Seventh Circuit has held that a written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence.  See Green v. Shalala, 51 F.3d 96, 101 (7th Cir.1995). Also, the Eighth Circuit has held that the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998). See also, Walker v. Secretary of Health and Human Services, 884 F.2d 241, 245 (6th Cir.1989)(reviewing court many examine all the evidence, even if it has not been cited in the Secretary's decision).

[6]  With respect to Claimant's subjective complaints of pain, the ALJ stated that Claimant's "statements concerning her impairments and their impact on her ability to work are credible in light of the report of the treating and examining practitioners and the findings made on examination."  (Tr. 32).  "Because he had the opportunity to observe the demeanor and to

she possessed the following RFC:

> The claimant has the following residual capacity to perform sedentary work. The record supports that she cannot stand or walk for prolonged periods of time with no limitations sitting. Lifting is limited to ten pounds when standing. She can use her hands for fine manipulation. She has moderate limitations in bending, stooping, lifting, walking, crawling, carrying, traveling, and pushing and pulling heavy objects. She is able to understand, remember and carry out short 1-2 step instructions; and there should be minimal interaction with others. (Tr. 34-35).

Although SSR 96-8p requires that the RCF must assess Claimant's "work-related abilities on a function-by-function basis," the ruling "does not require ALJs to produce such a detailed statement in writing." Delgado v. Comm'r of Soc. Sec., 30 Fed.Appx. 542, 547-548 (6th Cir. 2002)(quoting Bencivengo v. Comm'r of Soc. Sec., No. 00-1995, 2000 WL 1929759 (3rd Cir. Dec. 19, 2000)("Although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing. ... [T]he ALJs need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record."). Therefore, this Court must examine the record to determine whether there is substantial evidence for the ALJ's decision. As was stated above, the Court will not re-weigh or reappraise that evidence.

The ALJ determined Claimant's RFC based on the medical opinions of Claimant's

---

determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984)(citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

physicians and Claimant's daily activities. The ALJ indicated in his written decision that he had examined the entire record. (Tr. 34). The ALJ noted that Dr. Kerbyson found that Claimant ambulated with a normal gait; exhibited normal intellectual functioning; had good recent and remote memory; had normal grip strength bilaterally; could make a fist and perform fine finger manipulations, such as buttoning and picking up a coin. (Tr. 28-29, 131). Although Dr. Kerbyson noted problems in Claimant's lower extremities, his neurological examination revealed intact cranial nerves, 5/5 muscle strength, no atrophy, well-reserved sensory modalities and intact cerebellar function. (Tr. 132). Dr. Kerbyson opined that Claimant's ability to perform work-related activities, such as bending, stooping, lifting, walking, crawling, squatting, carrying and pushing heavy objects, was only moderately impaired. (Tr. 29, 132). Additionally, the ALJ noted that Dr. Stanley opined that Claimant could perform full-time work that allowed her to sit and did not require the operation of foot controls or extensive standing/wakling. (Tr. 29, 148). Moreover, Dr. Mir noted that Claimant had intact power in the upper extremities, 2 + reflexes and intact sensory. (Tr. 168, 172). Finally, Harry Hood, a State Agency medical consultant, opined that Claimant had normal memory, normal persistence, performed tasks at a normal pace and had only mildly deficient judgment, concentration and social functioning.[7] (Tr. 29-30, 177-178). The

_____

[7] Claimant also asserts that the ALJ failed to include Claimant's borderline intellect, reduced ability to respond to work pressures, reduced ability to use her hands and her standing and walking limitations. As was stated above, although the ALJ is required to indicate the weight given to all relevant evidence, Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984), the Fourth Circuit does not require that the ALJ discuss every piece of evidence. Therefore, the Court examines the record to determine whether there is substantial evidence for the ALJ's decision. In this case, the ALJ accounted for all of Claimant's limitations supported by the record. The ALJ noted that Claimant had no sitting limitation; could use her hands for fine manipulations; had standing limitations; and, moderate limitations in bending, stooping, lifting, walking, crawling, traveling and pushing and pulling heavy objects. (Tr. 32). Additionally, the ALJ noted that Claimant has the mental capacity to understand, remember and carry out short,

ALJ next addressed Claimant's statements concerning her daily activities. Claimant reported that she took care of her personal needs and grooming, prepared meals, did laundry, vacuumed, dusted, paid bills, mopped floors, washed dishes, ran errands and visited with friends and relatives. (Tr. 107-110). She also testified that she had no problems getting along with others, following instructions or concentrating. (Tr. 110). Additionally, Claimant testified that, although she had walking and standing limitations, she could sit "forever" and could lift up to ten pounds. (Tr. 217-218). It is the duty of the ALJ to make factual findings and resolve conflicts in the evidence. Hayes, 907 F.2d at 1456. This Court cannot say that, in light of the evidence of record and the evidence outlined in the ALJ's decision, there was not substantial evidence for the ALJ's determination of Claimant's RFC. Therefore, the ALJ properly determined Claimant's RFC.

## 2. THE ALJ FAILED TO FOLLOW THE PROPER PROCEDURE FOR ANALYZING MENTAL IMPAIRMENTS

Next, Claimant asserts that the ALJ failed to comply with the controlling regulations when analyzing Claimant's mental impairments. The Commissioner contends that the ALJ complied with the controlling regulations in analyzing Claimant's mental impairments.

20 C.F.R. § 404.1520 provides for a five-step evaluation to determine if a claimant is disabled. At step two, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that has met or is expected to meet the durational requirement of 12 months or more. If the claimant has such a severe impairment or impairments, the ALJ must determine whether the impairment(s) meet or medically equal a listed impairment. Finally, the ALJ must determine wether a claimant's impairment(s) prevent her from doing her past work or

---

one or two-step instructions and could have only minimal interaction with others. (Tr. 32).

other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520a provides further guidance specifically for evaluation of mental impairments.[8]  The section requires the ALJ to first evaluate the symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment.  If the ALJ determined the claimant has a medically determinable mental impairment, the ALJ must then "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [his] findings in accordance with paragraph (e) of this section."  Id. Once the ALJ has determined the claimant has a medically determinable mental impairment, he must then rate the degree of functional limitation resulting from the impairments in four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence and pace; and (4) episodes of decompression.  20 C.F.R. § 404.1520a.  This section requires that the ALJ or Appeals Council incorporate the pertinent findings and conclusions into their decisions.[9]

In this case, Claimant did not allege a disabling mental impairment in her application for disability benefits, did not offer it at the hearing as a basis for disability, and there was no

---

[8]  Section 404.1520a was amended in 2000.  The old § 404.1520a required the ALJ to complete and append a "Psychiatric Review Technique Form" (PRTF) to each decision.

[9]  Claimant cites Gutierrez v. Apfel, 199 F.3d 1048 (9th Cir. 2000), where the Court held that when there is a colorable claim of mental impairment, the failure of the ALJ to complete a PRTF requires a remand to the Social Security Administration.  Id. at 1051.  However, the new rules eliminated this requirement in favor of the ALJ or Appeals Council incorporating the pertinent findings and conclusions into their decisions.  See 20 C.F.R. § 404. 1520a.  "A colorable claim is one which is not 'wholly insubstantial, immaterial, or frivolous.'"  McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d 973, 981 (9th Cir. 2002)(quoting Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987)).  See also Dykstra v. Barnhart, 94 Fed. Appx. 449 (9th Cir. 2004).

evidence of significant treatment of a mental impairment in the record. The ALJ found that Claimant's depression was a medically determinable impairment that was "'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. 30). In this respect, the ALJ applied this four-part test to conclude that Claimant's "depression does [not] cause any marked limitations in activities of daily living, social functioning or concentration and [causes] no episodes of decompression." (Tr. 31).

Claimant also asserts that the ALJ failed to mention Claimant's GAF score of 45. However, under the regulations, an opinion of a social worker is accorded the weight of a layman, since this is not an acceptable medical source. See Lee v. Sullivan, 945 F.2d 687, 691 (4th Cir. 1991)(finding that chiropractor is not "acceptable medical source under the regulations and, therefore, is not qualified to make medical assessment."); 20 C.F.R. §§ 404.1513, 416.913 (providing a list of acceptable medical sources). As was stated above, although the ALJ is required to indicate the weight given to all relevant evidence, Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984), the Fourth Circuit does not require that the ALJ discuss every piece of evidence. In this case, Claimant's score of 45 did not establish mental impairment for purposes of Claimant's request for social security disability benefits without evidence that score impaired Claimant's ability to work. Camp v. Barnhart, 103 Fed. Appx. 352 (10th Cir. 2004). "Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work." Eden v. Barnhart, 109 Fed. Appx. 311, 314 (10th Cir. 2004). See also Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002)( "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's

accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate.").  In his RFC assessment, the ALJ properly accounted for Claimant's limitations caused by her mental impairments.  It is not the task of this Court to review the evidence and make an independent decision. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ.  Accordingly, the ALJ complied with the controlling law in analyzing Claimant's mental impairments.

3.  THE ALJ ERRONEOUSLY RELIED UPON THE TESTIMONY OF THE VE.

Finally, Claimant contends that the ALJ posed an improper hypothetical to the VE. Additionally, Claimant alleges that the ALJ improperly relied on the testimony of the VE because the requirements of the jobs conflicted with the requirements set forth in the DOT.  Commissioner counters that the ALJ posed a proper hypothetical to the VE and that the VE's testimony did not conflict with the DOT.

The question is whether the hypothetical question properly set forth all the relevant evidence of record concerning Claimant's impairments.  "The purpose of bringing in a vocation expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996).[10]  "[R]equiring the testimony of a vocational expert is discretionary."  Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981).  The Fourth Circuit Court of Appeals has held, albeit in unpublished opinion, that while questions posed to the vocational

---

[10]  This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record. <u>Russell v. Barnhart</u>, No. 02-1201, 2003 U.S. App. LEXIS 2178 (4th Cir. Feb. 7, 2003). The court further stated that the hypothetical question may omit non-severe impairments, but must included those that the ALJ finds to be severe. <u>Id</u>. Finally, the ALJ has great latitude in posing hypothetical questions and is free to accept or reject suggested restrictions so long as there is substantial evidence to support the ultimate question. <u>Koonce v. Apfel</u>, No. 98-1144, 1999 WL 7864, at * 5 (4th Cir. Jan. 11, 1999).

In this case, the ALJ's hypothetical to the Vocational Expert incorporated Claimant's limitations that are supported by the record and directly tracks the RFC finding. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

In the present case, the hypothetical was based directly on the ALJ's findings at the fourth step of the disability evaluation and addressed all of Claimant's limitations supported by the record. These findings were based on the ALJ's comprehensive review of the objective medical evidence and Claimant's account of her daily activities. The ALJ also accounted for Claimant's moderate limitations in bending, stooping, lifting, walking, crawling, carrying, traveling and pushing and pulling heavy objects in his hypothetical question by limiting the hypothetical individual to sedentary work.[5] (Tr. 225-226). In this case, the ALJ's hypothetical question

---

[5] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking is often necessary in carrying

contained all of Claimant's limitations supported by the record and, in response to the ALJ's proper question, the VE testified that the hypothetical individual could perform sedentary jobs, such as a packer and machine tender. (Tr. 33-34, 226).

Claimant asserts that the ALJ could not rely on the VE's testimony because the requirements of the jobs identified conflicted with the requirements set forth in the DOT. SSR 00-4p states, in part, that "occupational evidence provided by a VE . . . should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE and VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." Moreover, "[e]vidence from VEs or VSs can include information not listed in the DOT. The DOT contains information about most, but not all, occupations. The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term 'occupation,' as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs. Information about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling. The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the

---

out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a).

DOT." SSR 00-4p.

The DOT specifically provides that the job of stringing machine tender (DOT § 698.585-018) is an unskilled job performed at the sedentary exertional level. Claimant further contends that the sedentary machine tender jobs involve more than one or two steps. Since the DOT lists "maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings," the VE's testimony was not inconsistent with the DOT. See SSR 00-4.

Although the Undersigned was unable to find any sedentary "packer" positions in the DOT, the VE testified that there are 275 local and 95,000 national jobs of packer. (Tr. 226). See Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979)(noting that as few as 110 jobs constitute a significant number). Therefore, a significant number of jobs do exist in the national economy that Claimant could perform.

Therefore, the Court's review of the record indicates that the ALJ's questions to the VE included the limitations that he found were supported by the record. Accordingly, the testimony of the VE provided substantial evidence of a significant number of jobs in the national economy that claimant could perform.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly (1) assessed Claimant's RFC; (2) analyzed Claimant's mental impairments; and (3) relied upon the testimony of the VE.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.   A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: April 12, 2006

 /s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE